## Marks v. Lehigh Brickface, Inc.

*Robert J. Trace* and *C. Russell Welsh, Jr.*, for plaintiffs.

*Peter Paul Olszewski*, for defendant.

SOHN, J., February 9, 1959.—This case comes before the court as the result of a contract signed by the two plaintiffs, husband and wife, after two high pressure salesmen, representing defendant, had persuaded them to have their house covered by artificial stone. The contract was signed the same day defendant's representative approached the two plaintiffs, to wit, on February 17, 1954. Under the terms of the contract, plaintiffs were to pay for the stone and the financing charges the sum of $1,209.86, in 36 monthly installments. The contract called for the application of "Castle Stone" and plaintiffs, prior to the execution of the contract, were furnished by defendant's agent with a pamphlet describing "Castle Stone." Among the

many claims made by the brochure furnished to plaintiffs was the following statement:

"The secret of Castle Stone's ever-new look is in the making ... with true color 'locked in' during manufacture. The color permeates every particle of the stone. It can never come out. Sandblasting, acid or steam washing will not affect the glorious permanent Castle Stone colors."

The complaint alleges and the answer admits that plaintiffs executed the contract in reliance upon the representations contained in the pamphlet. The contract provided that:

"All workmanship and materials are fully guaranteed for thirty years."

The undenied testimony of plaintiffs was also that prior to the execution of the contract, plaintiffs informed defendant's agent that they were not interested in buying artificial stone if it faded, and that defendant's agents represented then that the stone to be applied positively would not fade.

A short time after the execution of the contract, the stone was delivered to plaintiffs' residence and the application was begun. At that particular time, plaintiffs called to the attention of defendant the fact that the boxes in which the stone was delivered were marked "Mansion Stone" and they were informed by defendant's agents that this and Castle Stone were identical and that only the name had been changed. Relying on this representation, plaintiffs permitted the stone to be applied to their home.

Simultaneously with the signing of the contract, plaintiffs signed a judgment note for the full amount of the purchase price, including the financing charges, which note was discounted by defendant at a New York bank to which plaintiffs made their payment under the contract. About one year later plaintiffs contacted defendant and complained that cracks had de-

veloped in the mortar with which the stone had been applied to the house, and shortly thereafter defendant's agents came and satisfactorily repaired these cracks. However, a few months after that more cracks developed and plaintiffs again contacted defendant requesting that they be repaired. Defendant failed to respond to the second request. Some time thereafter more cracks developed in the mortar and in the stones themselves and the color began to fade out of the stones, whereupon plaintiffs again contacted defendant requesting that repairs be made, and again no response was received. Shortly thereafter, during the month of June 1956, plaintiffs consulted their attorney, who in turn contacted defendant, whereupon the company appeared at plaintiffs' house to make repairs. This offer to repair was refused by plaintiffs on the advice of their counsel. At this particular time plaintiffs also, on the advice of counsel, continued to pay the balance then due on the note held by the New York bank.

The undenied testimony of plaintiffs was that after the time they consulted their attorney, the condition of the house, with respect to the fading of the stone, became steadily worse, and at the time of trial plaintiffs and six other witnesses testified that more than two-thirds of the stone on the house, which had originally been dark bluish gray in color and similar to plaintiffs' exhibit no. 6 which was introduced in evidence, was now the color of very light rough concrete, comparable to plaintiffs' exhibits nos. 4 and 5. Likewise, it was undenied that about two weeks before the trial, a representative of defendant company, who had inspected plaintiffs' house two months prior thereto, appeared at plaintiffs' home and the following discussion took place:

"Mrs. Marks: And he said, 'Let's walk around and look at the house.' We walked on two sides of the house

and I said, 'What did they send you here for this time?' He said, 'They sent me to repair the house.' I said, 'We had one patched up house, and we were advised not to let you repair it.' He said, 'Lady we can't repair this house.' "

Plaintiffs instituted this case in assumpsit asking for a return of the purchase price and their out-of-pocket expenses and punitive damages for the fraud of defendant in having knowingly misrepresented the product as an inducement to the signing of the contract by plaintiffs. Six months after the filing of the complaint defendant, without objecting thereto preliminarily, filed an answer alleging new matter. An answer to the new matter was filed and the case was listed for trial. At the trial a jury found a verdict in favor of plaintiffs in the sum of $1,609.96.

Defendant has filed a motion for judgment "non obstante veredicto" and has also filed a motion for a new trial, assigning in support thereof the usual stereotyped reasons and six additional ones.

The first objection raised by defendant in this case is that plaintiffs, who ask that the contract be rescinded and that they be made whole again, have failed to return or offer to return defendant to the status quo. This would require plaintiffs to return, or offer to return, the stone which had been applied to the house. The general principle of law that one who seeks to rescind a contract must in doing so return or offer to return the goods certainly cannot be insisted upon under the circumstances of this case.

Here the stone was applied to the cinder block wall of the house with mortar or cement, and various contractors testified that the stone would have to be chiseled off the house in order to make it possible for a new covering to be applied to it. The stone chiseled from the house would certainly be worthless and with-

out value. It is inconceivable to us that there would be anything left but a pile of broken stone or rubbish, which would certainly be worthless to anyone and probably not even worth the cost of hauling it away. In addition, the testimony was undenied that most of the stone had entirely lost its original color, and at the time was the color of light cement or concrete. One of defendant's own witnesses testified that it was impossible to put color back into the stone. Under the peculiar circumstances of this case, it is quite clear that an offer to return the stone would have been an entirely useless and empty gesture on the part of plaintiffs. In addition, we cannot lose sight of the fact that at the time this difficulty arose, defendant had been fully paid for its services and under the present law, where the goods have been paid for, a lien arises in favor of the purchasers, and as the result thereof, they would be entitled to keep the stone until the purchase price had been refunded. Section 2-711 of the Uniform Commercial Code of April 6, 1953, P. L. 3, 12A PS §2-711, now in force and effect, provides, inter alia:

"On rightful rejection or justifiable revocation of acceptance a buyer who has paid all or part of the price has a security interest in goods in his possession or control for the amount paid plus any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may on notifying the seller of his intention to do so hold such goods and resell them in like manner as an aggrieved seller."

Obviously, here defendant in this case has been in no way injured by the failure to offer to return or to return the stones, and such a return, if made, would have put plaintiff to considerable expense. It was estimated by plaintiffs' contractor-witnesses that anywhere from $350 to $400 would be the cost to remove the stone, and would have left plaintiffs without their

money and without any covering for their cinder block house.

In Sloane v. Shiffer, 156 Pa. 59, 64, the court commented with respect to the obligation to return or offer to return what has been received upon rescission of a contract as follows:

"But this rule is wholly an equitable one; impossible or unreasonable things, which do not tend to accomplish equity in the particular transaction, are not required . . ."

In this connection, see also Douglass v. Universal Auto Sales Corporation, 83 Pa. Superior Ct. 312. Here the ends of justice and the demands of equity would not be served by denying plaintiffs recovery for having failed to perform the empty and useless gesture of returning or offering to return goods which were obviously worthless and for which they had already paid $1,209.86.

In passing on this matter, we must take notice that the policy of the law in Pennsylvania is entirely changed with respect to the former requirement of the law which we have been discussing, by the Uniform Commercial Code which became effective three months after the contract in question was executed. Under the Uniform Commercial Code, an offer to return the goods after notice of rescission is given is no longer necessary. See Uniform Commercial Code, 12A PS §2-602(c) and §2-608(3). In the Pennsylvania Bar Association Notes with respect to the latter section, we find the following comment:

"(3) Subsection (3) somewhat changes prior law in situations where buyer's action must be termed 'rescission,' e.g. under §69(3) of the repealed Uniform Sales Act buyer had to 'return or offer to return' the goods. Code Sec. 2-602(2)(c). Cf. Douglass v. Universal Auto Sales Corp., 83 Pa. Super. Ct. 312 (1924) (no duty where return made impossible by

seller). A more substantial change results from allowing buyer to both 'rescind' and recover damages. See Sec. 2-711, infra."

Defendant is relying on the case of Pearsoll v. Chapin, 44 Pa. 9, 12 (1862). Even in this case the court, commenting on the requirements of the return or offer to return the seller to the status quo, indicated that plaintiff must only "do all that was necessary and reasonably possible to restore the parties to the condition in which they were before the contract, and then to show that he had good ground to rescind it."

Defendant maintains that a case of rescission was not proved in this case for the reason that plaintiffs failed to give timely notice of their election to rescind, and that accordingly the verdict in their favor should not stand. It is true that in a case of rescission notice must be given within a reasonable time, but it is also admitted by defendant's counsel that where, as in the present case, there are no disputed facts with regard to the problem of notice, the question is one of law which should be determined by the court.

Defendant in this case, however, has failed to point out that "the form of the notice [of rescission] is immaterial if it is positive and unequivocal": 8 P. L. E., §260, at page 284. Here the acts of plaintiff, under the testimony, clearly indicated that they wanted their money back and to be made whole, and those acts indicated that they were rescinding the contract. In 8 P. L. E. §261, page 286, it is held that:

"Generally, a contract may be rescinded by the acts as well as the words of the parties involved . . . A request for the repayment of money received under a contract may also be considered as an election to rescind."

As far back as the case of Morrow v. Rees, 69 Pa. 368, 373 (1871), it was held by Mr. Justice Sharswood as follows:

"Rees, the plaintiff, testified distinctly that in that conversation he asked Morrow, the defendant, if he was going to repay him his money. Morrow said he could not do that. *Now this was certainly evidence of rescission.*" (Italics supplied.)

It does appear in the record here that when counsel contacted defendant and defendant attempted to make repairs, the offer to repair was refused. This refusal to permit repairs was a positive and unequivocal action on the part of plaintiffs indicating a rescission of the contract. If plaintiffs at that particular time had been interested in the least in relying on defendant's warranty and asking that the defects appearing in the stone and in the workmanship be corrected, it would have been wholly inconsistent with such a desire to refuse to permit defendant to perform any work on the house.

We now come to the further question whether or not the notice to rescind in this case was given within such a reasonable time as is required by the law. The facts in the case were not in controversy, and therefore the question was one of law for the court to determine during the trial. Here the defects giving rise to plaintiffs' claim to rescind were of a peculiar nature in that they developed slowly and over a long period of time. It is true that plaintiffs admitted that they were satisfied with the job when it was completed, and that a year after it was done they were satisfied also with the repairs that had been made by defendant company up to that time. However, thereafter the cracking of the stones and the mortar became more widespread and the color began to fade out from at least two-thirds of the stones. As a result of the condition becoming progressively worse, plaintiffs reached a point where they could not and would not be satisfied with further repairs, for it was obvious even to an unskilled observer that the entire job was

bungled and was such that repairs would be impossible. One of defendant's own agents admitted to plaintiff-wife that the house could not be repaired. Under these circumstances, certainly the delay in rescinding the contract was fully justified. They should not be penalized because they waited to rescind the contract until the condition of the stone reached the point where they had no other alternative. We feel that we were also fully justified under the facts adduced from the testimony in finding that plaintiffs acted within a reasonable time after their single alternative had been determined. Defendant does not argue that no notice of rescission was given. Its complaint is that notice of rescission was delayed. In the motion for the nonsuit, defendant's counsel said:

"They cannot rescind the contract inasmuch as the plaintiffs did not give notice of rescission until over two years after the contract had been completed."

This is an out and out acknowledgment that they had received notice, but it ignores the fact that it was only after a period of time that this case ripened into one where rescission was proper. It is apparent from the testimony that the rescission took place almost immediately after plaintiffs reached the point where they realized that nothing else could be done. One year after the application of the stone, defendant made repairs. Some months thereafter they were notified that further repairs were required. Still later another notification was sent. Having received no reply to these two later notifications, plaintiffs consulted their attorney, who in turn contacted defendant, and at that time the record shows that the fading of the stones was becoming progressively worse, and they refused to permit further repairs. It therefore became perfectly clear that whatever delays occurred with respect to the notice of rescission, those delays were for the benefit of defendant and rescission oc-

curred only after defendant had been given repeated notice of the developing condition and after the condition become so bad that no repairs could be made. We have some recent decisions on the matter of defects appearing after a considerable length of time has occurred.

In Frantz Equipment Company v. The Leo Butler Company, 370 Pa. 459, 467, Mr. Justice Stern commented in a case involving a defective hoist upon which repeated repairs had been attempted by the seller, as follows:

"The tests which were employed revealed defects of various kinds, and defendant properly gave to the manufacturer the opportunity to make such adjustments, repairs and replacements as might correct them; it was only after all such attempts were ineffectual that defendant became obliged to notify plaintiff of its election to rescind the sale."

Again, in Kirk Johnson Co., Inc. v. Light, 100 Pa. Superior Ct. 425, 427, 428, it was pointed out that where the article sold is a machine which is subject to adjustment and repair, the situation differs from one where defects or breaches of warranty are at once discoverable. It was there said by Judge Keller that:

"He [defendant] was not bound to rescind the contract and insist on the instrument being removed as long as there was a reasonable likelihood of the plaintiff's being able to overcome the defects, and it desired the chance to do so. Plaintiff's continual attempts to fix the instrument, conformably to its guaranty, did not deprive defendant of his right to rescind as soon as he was satisfied that it could not be made to work satisfactorily."

In the case before us, plaintiffs clearly demonstrated their desire to rescind when the situation reached the point where there was no reasonable likelihood that the defects could be overcome.

Likewise, in Truscon Steel Company v. Fuhrmann & Schmidt Brewing Company, 327 Pa. 10, 13, Mr. Chief Justice Stern again stated for a unanimous court that:

"There are some cases which allow to purchasers apparently lengthy periods for discovery of defects in merchandise and notification of the seller. This is because considerable time may be needed, according to the nature of the goods, to ascertain whether a shipment complies with a warranty."

The language of Mr. Chief Justice Stern can be applied equally to the situation which has developed in the instant case. See also Industrial Rayon Corporation v. Caplan, 125 Pa. Superior Ct. 414.

Defendant complains about the charge of the court, although at the trial he took no general or special exceptions to it. First, he complains about the charge regarding the requirement for a reasonable notice of the rescission. Defendant in its own brief makes it quite clear that this was a question of law for the court which it was not necessary for us to submit to the jury. Another complaint is that plaintiff did not prove a material breach of the contract and that the court did not charge with respect to this point. Plaintiffs, however, did prove by uncontradicted testimony that most of the stones had faded from a dark blue-gray to a color similar to light concrete, that approximately one-fourth of the stones on the house were cracked, that the mortar was cracked and that some of the stones had fallen from the house. It was also proved by uncontradicted testimony that the house could not be repaired, that the color could not be restored and that defendant represented that the stone positively would not fade. Defendant's witnesses testified in answer to this and it is even argued in defendant's brief, that all stone fades, that this job was no worse than any other job performed with artificial

stone. As a matter of common sense, the jury, if it believed, as it obviously did, the testimony of plaintiffs, had no alternative but to find a breach of the contract, and under the circumstances such a breach could not possibly be anything but a material breach since defendant's own witnesses testified that the condition could not be repaired. We cannot find in our charge that we mentioned the very words, "material breach," but we reviewed the testimony exhaustively and in detail and left to the jury the question of whether the contract had been "substantially complied with." It must obviously follow that if the contract had not been substantially complied with, a material breach had indeed occurred.

Defendant claims also about our charge with regard to the measure of damages. Defendant argues that they represented "damages due to a breach of the contract, not for damages based on rescission." However, the very essence of the remedy of rescission is to put the parties back in the status quo, that is, to put them in the position they would have been in had the contract never been consummated. To put plaintiffs in status quo would mean a return not only of the money expended but of the money required to effect a removal of the defective materials applied to the house. Indeed, defendant could not complain that as a result of the failure of its materials and workmanship to live up to the warranty made by it, it has been called upon to pay the cost of removing it from the house and restoring plaintiffs to the status quo.

The argument has been advanced by defendant that plaintiffs are not entitled to recover because they agreed to the change from Castle Stone to Mansion Stone. This argument entirely overlooks the undisputed testimony that the agreement was made only because plaintiffs were advised by defendant's agent that it was the same stone, the name of which only had

been changed. Later it appears in defendant's own testimony that Castle Stone was made by an entirely different company. However, the stone which was applied, by whatever name it might be called, did not live up to the warranties made with respect to it. The real purpose back of the introduction of such testimony was to prove fraud on the part of defendant. During the trial the court advised plaintiffs' counsel that it would not permit the question of punitive damages for fraud to be considered by the jury and the pursuit of such damages was thereupon abandoned by plaintiffs.

Defendant also advances the argument that plaintiffs cannot rely upon rescission of the contract since they continued to pay the purchase price after the rescission occurred. These payments were made by plaintiffs solely on the advice of counsel. It appears of record that the note plaintiffs signed was held and discounted by a New York bank which was not a party to the controversy, and upon the advice of plaintiffs' counsel it was better to choose to surrender their right to rescind than to render themselves liable to execution by the New York bank on a judgment which had already been entered in Dauphin County.

We believe that this verdict must be supported by an overall view of the trial. Defendant, after verdict, now raises a lot of claims which it did not raise at the time the complaint was originally filed, or at any time during the course of the trial. No preliminary objections were filed to the original complaint and no general exception or special exceptions were taken during the course of the trial to the charge of the court. The verdict of the jury was amply supported by uncontroverted evidence. In effect the only testimony offered by defendant was to the effect that this job was no better or no worse than any other job performed by it. Plaintiffs' testimony clearly shows that

the stone on the house was very badly faded and defendant's testimony admits this. It comes with bad grace at this late date to say that all stone fades, especially in view of the representation of the defendant's agents that the stone would never fade. We, therefore, are compelled to make the following

*Order*

And now, February 9, 1959, all of defendant's reasons for a new trial, as well as its motion for judgment non obstante veredicto, are overruled, and it is ordered that judgment be entered upon the verdict.